IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KWASI SEKOU MUHAMMAD, a/k/a MICHAEL WINSTEAD, | |
| Plaintiff, | Civil No. 05-4999 (JBS) |
| v. | **OPINION** |
| DEPARTMENT OF CORRECTIONS, et al., | |
| Defendants. | |

APPEARANCES:

Jerry L. Tanenbaum, Esq.
John M. Armstrong, Esq.
Tracey D.P. Overton, Esq.
SCHNADER, HARRISON, SEGAL & LEWIS
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1165
    Attorneys for Plaintiff

Susan Marie Scott, Deputy Attorney General
OFFICE OF THE NJ ATTORNEY GENERAL
RJ Hughes Justice Complex
P.O. Box 112
Trenton, NJ 08625
    Attorney for Defendants New Jersey Department of
    Corrections, Officer DeMaio, and Officer Williams

David J. Bishop, Esq.
CRANMER, BISHOP, MARCZYK & O'BRIEN, PC
508 New Jersey Avenue
Suite B3
Absecon, NJ 08201
    Attorney for Defendants Correctional Medical Services, Inc.;
    Dr. Chenna G. Reddy; and Loretta Terry

**Simandle,** District Judge:

## I.   INTRODUCTION

Plaintiff Kwasi Sekou Muhammad is an inmate who is presently confined at East Jersey State Prison in Woodbridge, New Jersey, and who was previously confined at the Albert C. Wagner Youth Correctional Facility ("ACWYCF") and at South Woods State Prison ("South Woods").  Plaintiff's left leg was amputated below the knee prior to his incarceration, and he consequently uses a prosthesis to ambulate.  Plaintiff filed two lawsuits against numerous defendants affiliated with the New Jersey Department of Corrections (the "DOC Defendants") and Correctional Medical Services, Inc. (the "CMS Defendants"), alleging that Defendants violated his Eighth Amendment rights, Title II of the Americans with Disabilities Act, and New Jersey common law by responding inadequately to his medical needs and failing to accommodate his disability over the course of his confinement.

The DOC Defendants and CMS Defendants filed separate motions for summary judgment as to all of Plaintiff's claims [Docket Items 96 and 97].  The principal issue to be decided is whether Congress validly abrogated the State's sovereign immunity in enacting Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12165, as the statute applies in the context of a disabled prison inmate who is denied access to handicapped-accessible bathing facilities.  For the reasons explained below,

the Court will (1) grant the motion for summary judgment of Defendants Reddy, Terry, and CMS as to all of Plaintiff's claims; (2) grant the DOC's motion for summary judgment as to Plaintiff's ADA claim arising out of the provision of inadequate medical treatment; (3) deny the DOC's motion for summary judgment as to Plaintiff's ADA claim arising out of the conditions of his confinement; and (4) deny Defendants Williams' and DeMaio's motion for summary judgment as to Plaintiff's Eighth Amendment claims.

## II.  BACKGROUND

### A.  Facts

#### 1.   Medical Treatment at ACWYCF

Plaintiff is an inmate who is presently incarcerated at East Jersey State Prison in Woodbridge, New Jersey, and who is serving a thirteen-year sentence. (Muhammad Aff. ¶ 1.) Prior to his incarceration, when he was fourteen years of age, Plaintiff's left leg was amputated below his knee; he has used a prosthetic leg since that time. (Id. at ¶ 2.)

Plaintiff was incarcerated at the ACWYCF beginning in September 2001. (Id. at ¶ 4.) Plaintiff began to experience difficulties with his prosthesis shortly after his incarceration at ACWYCF – his medical records show that his prosthesis was "ill-fitting" and had a broken foot, and that as a result of the poor fit, Plaintiff developed blisters on his leg. (Johnson

3

Decl. Ex. B at 27-30.)  Plaintiff informed CMS of the problems
with his prosthesis on January 2, 2002, and he received his new
prosthetic leg on June 7, 2002.  (Id. at 30, 36.)

On October 30, 2002, Plaintiff made an appointment with CMS
to see a doctor on an emergency basis in order to address the
pain that the problem with his prosthesis was causing.  (Muhammad
Aff. ¶ 6.)  For reasons that are not evident in the record,
Plaintiff was unable to see the physician that day.  (Id.)  As he
was returning to his housing unit from the infirmary, the foot on
Plaintiff's prosthesis broke, causing Plaintiff to fall down two
flights of stairs.  (Id.; Johnson Decl. Ex. B at 42.)  Shortly
after the fall, Plaintiff was taken to St. Francis Medical Center
for evaluation, and upon his return to ACWYCF later that day,
Plaintiff was admitted to the infirmary, where he was given
Motrin to manage the pain in his back and hip.  (Johnson Decl.
Ex. B at 53-54.)  Plaintiff remained under observation in the
infirmary until November 1, 2002, when he was discharged, (id. at
74); during his stay at the infirmary, Plaintiff was provided
Motrin for pain management.  (Id. at 67.)  Plaintiff informed the
infirmary staff that he did not like to take pain medication.
(CMS Defs.' Br. Ex. 1 at 260.)

Between Plaintiff's discharge from the infirmary on November
1, 2002 and September 24, 2003, when he was transferred from
ACWYCF to South Woods, Plaintiff continued to experience back

4

pain as a result of his fall, for which he sought treatment from the medical unit at ACWYCF on numerous occasions.[1]  (Johnson Decl. Ex. B at 126.)  On November 7, 2002, Plaintiff complained to a nurse at the medical unit of continuing back and joint pain, for which he was given Motrin.  (Id. at 78.)  On November 12, 2002, Plaintiff was seen by a nurse practitioner for his ongoing complaints of pain, and the nurse practitioner provided Plaintiff with Naprosyn, an anti-inflammatory medication, for thirty days.  (Id. at 79-81.)  On November 25, 2002, Plaintiff was seen by Dr. Channa Reddy, one of the CMS Defendants in this action, who admitted Plaintiff to the infirmary in order to conduct spinal and lumbrosacal x-rays.  (Id. at 86-88.)  On December 10, 2002, Plaintiff visited the medical unit and was seen by a nurse, who "instructed [Plaintiff] on alternative techniques to cope with his discomfort."  (Id. at 89-91.)  Two days later, on December 12, 2002, Dr. Reddy saw Plaintiff again and provided Naprosyn.  (Id. at 90-91.)  Plaintiff again visited the medical unit on January 22, 2003, where he was attended by a nurse, who noted Plaintiff's "easy calm manner," found that Plaintiff was not in "acute distress," and offered Motrin.  (Id. at 97.)

On February 13, 2003, Plaintiff again visited Dr. Reddy.

---

[1]  Also during this period, Plaintiff failed to appear at several appointments he made with CMS, and CMS rescheduled several appointments Plaintiff had made.  (Johnson Decl. Ex. B at 82, 84-86, 88, 107.)

(Id. at 102.)  Plaintiff informed Dr. Reddy that he continued to experience pain in his back and asked Dr. Reddy to prescribe physical therapy.  (Muhammad Aff. ¶ 9; Reddy Dep. at 35.)  Dr. Reddy observed that Plaintiff "ambulated with no difficulty," determined that physical therapy would "not improve his present medical condition," and found that Plaintiff had "attained [a] point of max[imum] recovery."  (Johnson Decl. Ex. B at 102-03.) Dr. Reddy provided Plaintiff with additional Naprosyn and observed that Plaintiff was "not happy with [his] advice." (Id. at 103.)

On June 26, 2003, Plaintiff returned to the medical unit to address a sore that had developed on his knee above his prosthesis.  (Id. at 115.)  Plaintiff was seen by a nurse who provided Triple A Ointment for the sore.[2]  (Id. at 116.)

### 2.  Medical Treatment at South Woods

Plaintiff was transferred from ACWYCF to South Woods on September 24, 2003 without having received the physical therapy that he desired.  (Id. at 126.)  That day, a nurse at South Woods performed a transfer admission assessment, in which the nurse designated in Plaintiff's medical records that he was to be

---

[2]  Plaintiff visited the infirmary at ACWYCF on multiple additional occasions prior to his September 24, 2003 transfer for reasons not related to his back pain or his difficulties with his prosthesis.  Plaintiff's medical records indicate that he received medical treatment for these complaints.  (CMS Defs.' Br. Ex. 1 at 204, 208.)

restricted to lower bunks on account of his disability.  (CMS Defs.' Br. Ex. 1 at 181.)  Between his arrival at South Woods and March 27, 2004, Plaintiff visited the prison infirmary approximately ten times for treatment of ailments ranging from a fever to dry skin on his left knee above his prosthesis.  (Id. at 149-175.)  Plaintiff does not appear to have complained of back pain at any of these visits, and indeed, Plaintiff was repeatedly noted to have "deni[ed] any other problem or complaints at [the] time" of his visits.  (Id. at 162, 167, 174.)

On March 27, 2004, Plaintiff visited the prison infirmary and, for the first time since being transferred to South Woods, complained that he was experiencing back pain.  (Id. at 148.)  Plaintiff was noted to be in no distress and was ambulatory with a steady gait.  (Id.)  Plaintiff was scheduled for a visit with a prison physician, and on March 31, 2004, Dr. Steven Hoey prescribed Plaintiff pain medication and ordered that an x-ray on Plaintiff's spine be performed.  (Id. at 146.)  Plaintiff returned to the infirmary on April 2, 2004, where he saw a nurse and again complained of back pain.  (Id. at 140.)  Plaintiff informed the nurse that he was not consistently taking his pain medications, and the nurse instructed him to take the medication. (Id.)

On April 7, 2004, the results from Plaintiff's spinal x-ray revealed that he suffered from "[m]ild degree scoliosis, no

7

significant further abnormality." (Id. at 139.)  The next day,
Plaintiff was referred to a physical therapy consultation. (Id.
at 138.)  Plaintiff first visited Robert Capri, a physical
therapist, on April 20, 2004 and continued with his physical
therapy sessions on an intermittent basis until October 28,
2004.[3] (Id. at 103.)  Plaintiff was not seen by CMS for
complaints of back pain following the conclusion of his physical
therapy program.

        3.   Conditions of Confinement at South Woods

     When Plaintiff arrived at South Woods, in accordance with
the lower bunk-only prescription in his medical records, (id. at
181), Plaintiff was assigned to a lower bunk in a handicapped-
accessible cell on the first floor. (Muhammad Aff. ¶ 13.)  As a
result of Plaintiff's handicapped-accessible cell assignment, he
was able to "access [his] bunk easily, without the need to climb
a ladder," (id. at ¶ 14), and was also able to shower every day
because his cell was across the hall from the handicapped-
accessible restroom and shower facilities. (Id. at ¶ 15.)

     On October 13, 2004, over protests from Plaintiff regarding

_____

     [3]  While Plaintiff was initially prescribed only six
sessions with the physical therapist, Plaintiff failed to appear
at numerous sessions, which resulted in his physical therapy
program being extended over many months. (CMS Defs.' Br. Ex. 1
at 100, 105, 106, 116, 119, 120, 128.)

his disability,[4] Defendant Corrections Officer Williams transferred Plaintiff to an upper-level bunk in a cell on the second floor "far away from the handicap[ped-]accessible shower." (Id. at ¶ 16.)  According to Plaintiff, the inmate who replaced him on the lower bunk of the first-floor cell "had no reason for a handicapped cell as he had no physical disability."  (Id. at ¶ 17.)  Plaintiff experienced "great pain in [his amputated] limb and back" when he attempted to climb in and out of the upper bunk, and also experienced "significant pain" as a result of "[c]limbing and descending the stairway [from the second floor] on a daily basis."  (Id. at ¶ 18.)

The cell transfer also inhibited Plaintiff's ability to shower.  While other inmates housed in cells on the second floor were able to use the second-floor shower facilities, those showers were not handicapped-accessible, and Plaintiff was thus unable to use the second-floor showers.  (Id. a ¶ 21.)  Instead, Plaintiff had to go to the first floor in order to use the handicapped-accessible shower.  (Id.)  However, because Plaintiff

_____

[4]   According to evidence proffered by the DOC Defendants, Plaintiff volunteered to transfer to the upper-level bunk in the second-floor cell, and Officer Williams was unaware of Plaintiff's disability and the medical restriction limiting Plaintiff to bottom bunks.  (Williams Dep. at 6-7, 15, 18, 25.)  Given that upon summary judgment "the nonmoving party's evidence is to be believed and all justifiable inferences are to be drawn in [that party's] favor," Plaintiff's account of these disputed facts must be accepted as true for purposes of deciding Defendants' motion.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (internal quotations and citations omitted).

was not permitted to wait near the handicapped-accessible shower
for it to become available, but was instead required to wait by
his cell on the upper tier while other inmates – including those
without disabilities – used the shower, and because non-disabled
inmates on the second tier were able to rush down the twenty
stairs to the handicapped-accessible shower more quickly than
Plaintiff, Plaintiff had limited access to the shower following
his transfer to the second-tier cell.  (Id. at ¶¶ 19-21.)  On
those occasions when the shower did become available, as a result
of having to wait and to walk with difficulty down the flight of
stairs, Plaintiff had less than ten minutes to shower, which, he
alleges, was "not an appropriate amount of time for [him] to
complete [his] shower due to all the cleaning and handling [he
had] to do with [his] prosthesis and stump."  (Id. at ¶ 21.)  The
upshot of Plaintiff's cell transfer, he testified, was that he
"wasn't able to take showers."  (Muhammad Dep. at 45.)

Plaintiff raised his concerns over the pain he experienced
accessing his upper-level bunk on the second floor and his
difficulty showering with Defendants Williams and DeMaio, and
requested that he be transferred back to a lower-level bunk on
the first floor.  (Muhammad Aff. ¶ 22.)  Notwithstanding the fact
that his lower bunk restriction was "clearly indicated throughout
[his] medical file," (id. at ¶ 23), the officers refused to
transfer Plaintiff.  (Id. at ¶ 22.)  Plaintiff subsequently

10

submitted a health services request to CMS in order to obtain a
document evidencing his lower bunk restriction.  (Id. at ¶ 25.)
Plaintiff was seen by Defendant Nurse Loretta Terry, to whom
Plaintiff explained that he needed documentation of his lower
bunk restriction.  (Id. at ¶ 27.)  According to Plaintiff,
Defendant Terry "failed to provide [him] with this paperwork,"
(id. at ¶ 28), but instead "gave the plaintiff paperwork to clear
the me[t]al detectors."  (Compl. at 9.)  Plaintiff remained
housed on the upper bunk of the second-floor cell for five
months, notwithstanding his complaints and requests to be
transferred.  (Id.)

**B.  Procedural History**

Plaintiff, initially proceeding pro se, filed two lawsuits
arising out of the above-described series of events on October
18, 2005.  First, Plaintiff filed suit against the DOC, CMS, and
Dr. Reddy, alleging that in failing to provide him with physical
therapy, the Defendants had been deliberately indifferent to his
medical needs in violation of the Eighth Amendment; that this
inadequate medical treatment violated Title II of the ADA; and
that Dr. Reddy had committed medical malpractice in violation of
New Jersey law.[5]  In its August 14, 2005 Opinion and Order

---

[5]  Plaintiff also named as Defendants in the first lawsuit
Corrections Officers Kidwell and Sexton, as well as a private
company called Harry J. Lawell & Son, Inc., which had
manufactured his prosthetic leg.  (Compl. at 1.)  In its August
14, 2005 Opinion and Order [Docket Items 8 and 9], the Court

11

[Docket Items 8 and 9], the Court, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, dismissed Plaintiff's Eighth Amendment claim against the DOC and Plaintiff's ADA claim against Dr. Reddy.  The Court permitted Plaintiff's ADA claims against the DOC and CMS, his Eighth Amendment claims against CMS and Dr. Reddy, and his medical malpractice claim against Dr. Reddy to proceed, although it noted that these claims were possibly time-barred.

In his second Complaint, filed against the DOC, CMS, and Defendants Williams, DeMaio, and Terry, Plaintiff alleges that his transfer from the handicapped-accessible cell on the first floor to the upper bunk of a second-floor cell violated his rights under the Eighth Amendment and the ADA.  These two actions were subsequently consolidated by order of Magistrate Judge Donio [Docket Item 81].

On June 12, 2007, after Plaintiff moved for the appointment of pro bono counsel and the DOC Defendants moved to dismiss Plaintiff's Complaint, the Court issued an Opinion and Order [Docket Items 61 and 61] granting Plaintiff's motion for the appointment of pro bono counsel and dismissing the DOC Defendants' motion to dismiss without prejudice to reinstatement following the entry of appearance by Plaintiff's pro bono

_____

determined that Plaintiff's claims against these Defendants were barred by the applicable statutes of limitations and dismissed these Defendants from the litigation.

counsel; Plaintiff's counsel subsequently entered an appearance and the DOC Defendants' motion to dismiss was reinstated thereafter.  The Court heard oral argument on the motion to dismiss at a hearing convened on December 12, 2007, and denied the DOC's motion without prejudice to its "right to challenge the factual sufficiency of plaintiff's claim and to seek to demonstrate sovereign immunity again at the summary judgment stage."[6]  (Docket Item 85 at 1-2.)

After the close of the discovery period, the DOC Defendants and the CMS Defendants filed the motions for summary judgment presently before the Court [Docket Items 96 and 97].  The Court heard oral argument on the parties' motions at a hearing convened on November 6, 2008 and reserved decision.

### III. DISCUSSION

As the preceding summary of Plaintiff's claims makes clear, the constitutional, ADA, and common law claims at issue in this case arise out of two distinct series of events: first, the failure to provide Plaintiff with physical therapy to treat his back pain, and, second, the transfer of Plaintiff from a handicapped-accessible cell on the first tier at South Woods to a second-floor cell with limited access to the handicapped-accessible shower facilities.  The following discussion sets

---

[6]  The Court also granted Defendants' motion to dismiss Plaintiff's claim for punitive damages against the DOC, which Plaintiff did not oppose.

forth the applicable standard governing the Court's review of Defendants' motions for summary judgment and separately addresses the claims arising out of these two distinct series of events. As the following analysis makes clear, the Court finds that Plaintiff's constitutional, ADA, and common law claims arising out of the allegedly inadequate medical treatment he received at ACWYCF before transfer on September 24, 2003 are time-barred and will grant Defendants' motions for summary judgment as to these claims. Because there are genuine issues of material fact as to Plaintiff's ADA claim against the DOC and his Eighth Amendment claims against Defendants Williams and DeMaio, all arising while Plaintiff was confined at South Woods State Prison on and after September 24, 2003, the Court will deny Defendants' motions as to these claims.

### A.    Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v.

14

Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

Although entitled to the benefit of all justifiable inferences from the evidence, "the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered."  United States v. Premises Known as 717 South Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e)) (citations omitted).  As the Supreme Court has explained,

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotations and citations omitted).

   B.   **Statute of Limitations on Claims Relating to Medical Treatment at ACWYCF**

Plaintiff asserts a variety of claims against multiple Defendants arising out of the failure to provide him with physical therapy to treat his complaints of back pain when he was confined at ACWYCF.[7]  These claims include Plaintiff's Eighth Amendment claim against Dr. Reddy and CMS, his medical malpractice claim against Dr. Reddy, and his ADA claims against DOC and CMS.[8]  The Court finds that these claims are time-barred and will grant Defendants' motions for summary judgment as to these claims.

All of Plaintiff's claims arising out of the allegedly substandard provision of medical services are subject to a two-year statute of limitations.  See O'Connor v. City of Newark, 440 F.3d 125, 126-27 (3d Cir. 2006) ("For section 1983 actions in New Jersey, that statute is N.J.S.A. 2A: 14-2, which provides that an action for injury to the person caused by wrongful act, neglect, or default, must be convened within two years of accrual of the cause of action") (internal quotations and citations omitted); Disabled in Action of Pennsylvania v. Southeastern Pennsylvania

---

      [7]  In its August 14, 2005 Opinion and Order, the Court held that Plaintiff's claims arising out of his October 30, 2002 fall, which apparently resulted from a defect in his prosthetic leg, were time-barred.  (Docket Item 8 at 22.)

      [8]  Plaintiff's separate ADA claims against the DOC and CMS arising out of the conditions of his confinement is discussed separately infra.

Transportation Authority, 539 F.3d 199, 208 (3d Cir. 2008)
(holding that "the statute of limitations applicable to claims
under Title II of the ADA . . . is the statute of limitations for
personal injury actions in the state in which the trial court
sits"); McGrogan v. Till, 327 N.J. Super. 595, 603 (App. Div.
2000) ("A medical-malpractice action . . . is governed by the
two-year [limitations] period."). Plaintiff initiated both of
these actions on September 26, 2005,[9] which means that his claims
that accrued before September 26, 2003 are time-barred.

Plaintiff's constitutional, ADA, and malpractice claims
relating to Defendants' failure to provide him with physical
therapy for his back pain all accrued prior to September 26,
2003. Plaintiff injured his back on October 30, 2002, (Muhammad
Aff. ¶ 6), and visited Dr. Reddy for treatment of his back pain
on November 25, 2002, December 12, 2002, and February 13, 2003.
(Johnson Decl. Ex. B at 86-88, 90-91, 102-03.) Plaintiff appears
to have first asked Dr. Reddy to prescribe physical therapy on

---

[9] Although the electronic Docket indicates that Plaintiff's
Complaints were not filed until October 18, 2005, Plaintiff typed
the words "Date: 9-26-05" on each Complaint [Docket Item 1]. For
purposes of deciding Defendants' summary judgment motions, the
Court gives Plaintiff the benefit of all favorable inferences and
assumes that September 26, 2005 was the date Plaintiff "delivered
the [pleadings] to prison authorities for forwarding to the
District Court." Houston v. Lack, 487 U.S. 266, 270 (1988). As
the following discussion demonstrates, Plaintiff's claims arising
out of the failure to provide physical therapy are untimely,
regardless of whether the action was initiated on September 26 or
October 18.

February 13, 2003, (id. at 102-03), and, according to Plaintiff, he "continuously asked Dr. Reddy for physical therapy" after this date. (Muhammad Aff. ¶ 9.)  Even giving Plaintiff the benefit of all favorable inferences and assuming that he asked Dr. Reddy for physical therapy until September 24, 2003, the day he was transferred from ACWYCF to South Woods, (Johnson Decl. Ex. B at 126), Plaintiff's claims relating to the denial of his request for physical therapy at ACWYCF accrued on September 24, 2003 at the latest.  The statute of limitations on these claims accordingly expired on September 24, 2005, making Plaintiff's September 26, 2005 filing in this case untimely.[10]

In an effort to overcome the apparent untimeliness of his medical care claims, Plaintiff seeks to rely upon the "continuing violations theory," under which "a plaintiff may pursue a claim for conduct that standing alone would have been untimely as it occurred before the start of the applicable statute of limitations filing period as measured back from the time of the filing of the action." McAleese v. Brennan, 483 F.3d 206, 218 (3d Cir. 2007).  According to Plaintiff, because he was not actually referred to a physical therapist until April 2004, Defendants' failure to provide physical therapy until that date constituted a continuing violation, rendering timely his September 26, 2005 filing in this case.

----

[10]  See note 9, supra.

Plaintiff's reliance upon the continuing violations theory is misplaced.  As the Court of Appeals has explained:

> To establish that a claim falls within the continuing violations theory, a plaintiff must do two things: (1) he must demonstrate that at least one act occurred within the filing period, and (2) he must establish that the conduct is more than the occurrence of isolated or sporadic acts, i.e., the conduct must be a persistent, on-going pattern.

Id. (internal quotations and citations omitted); see also West v. Philadelphia Elec. Co., 45 F.3d 744, 754-55 (3d Cir. 1995).

Plaintiff cannot satisfy the first prong of this standard. Under the first prong, "[t]he crucial question is whether any present violation exists."  West, 45 F.3d at 754 (quoting United Airlines, Inc. v. Evans, 431 U.S. 553, 558 (1977)) (emphasis omitted).  Under the most generous construction of Plaintiff's evidence, the latest instance of Plaintiff requesting and being denied physical therapy took place on September 24, 2003, when he was transferred from ACWYCF to South Woods, (Johnson Decl. Ex. B at 126); as Plaintiff states in his Affidavit, he "continuously asked Dr. Reddy for physical therapy."  (Muhammad Aff. ¶ 9) (emphasis added).  According to the evidence in the record, Plaintiff did not again seek treatment for his back injury or articulate any request for physical therapy until March 27, 2004, when he visited the infirmary at South Woods and complained of

back pain.[11]  (CMS Defs.' Br. Ex. 1 at 148.)  In response to this
complaint, the nurse at South Woods immediately scheduled
Plaintiff for an appointment with a prison physician, who ordered
an x-ray of Plaintiff's spine and referred Plaintiff to a
physical therapy consultation the day after the x-ray results
were available.  (Id. at 138-39, 146.)

The evidence in the record thus demonstrates that, contrary
to Plaintiff's suggestion that his "repeated requests for
treatment and the denials thereto continued through May 27, 2004,
when he finally received the needed treatment," (Pl.'s Opp'n Br.
at 13), the final denial of his request for treatment occurred
before his September 24, 2003 transfer to South Woods, which was
more than two years before this action was commenced.  In other
words, Plaintiff made no requests for treatment that any
Defendant denied "within the filing period," McAleese, 483 F.3d
at 218 (citation omitted); the only request for treatment of his
back pain that Plaintiff made within the two-year filing period
was his March 27, 2004 visit to the infirmary, when he complained
of back pain and was promptly examined, x-rayed, and prescribed

---

[11]  As is noted, supra, Plaintiff visited the South Woods
infirmary approximately ten times between his September 24, 2003
transfer and March 27, 2004, but nothing in the record suggests
that he complained of back pain or requested physical therapy.
(CMS Defs.' Br. Ex. 1 at 149-175.)  To the contrary, Plaintiff
was repeatedly noted to have "deni[ed] any other problem or
complaints at [the] time" of his visits.  (Id. at 162, 167, 174.)

physical therapy.  Because none of the allegedly unlawful denials of Plaintiff's requests for physical therapy occurred within the two-year statute of limitations applicable to his Eighth Amendment, ADA, and malpractice claims, his claims relating to Defendants' allegedly inadequate provision of medical care are untimely.  The Court will thus grant Defendants' motions for summary judgment as to Plaintiff's medical care claims.

### C.   Conditions of Confinement Claims

Plaintiff alleges that, while confined at South Woods State Prison, his transfer from a first-floor, handicapped-accessible cell to the upper-level bunk of a second-floor cell, from which he had limited access to the handicapped-accessible shower on the first floor, violated his rights under the Eighth Amendment and Title II of the ADA.[12]  Plaintiff asserts his Eighth Amendment claims, brought pursuant to 42 U.S.C. § 1983, against Defendants Williams and DeMaio, the officers who executed the transfer, and asserts his ADA claim against the DOC, an agency of the State of New Jersey.[13]

---

[12]  The claims arising out of Plaintiff's transfer to a handicapped-inaccessible cell do not implicate the statute of limitations concerns that his medical treatment claims raise. Plaintiff's transfer took place on October 13, 2004, meaning that this case was filed well within the two-year statute of limitations.  (Muhammad Aff. ¶ 16.)

[13]  Plaintiff also asserts an Eighth Amendment claim against Defendant Terry, a nurse at South Woods, and an ADA claim against CMS.  According to Plaintiff, Defendants Terry and CMS were responsible for Plaintiff's conditions of confinement because

In its motion for summary judgment, the DOC argues that
Plaintiff's ADA claim against it must be dismissed on Eleventh
Amendment immunity grounds, because Congress's purported
abrogation of its sovereign immunity in Title II was invalid
under City of Boerne v. Flores, 521 U.S. 507 (1997), and its
progeny.  In response, Plaintiff argues that, under United States
v. Georgia, 546 U.S. 151, 159 (2006), Title II of the ADA validly

---

when Plaintiff requested documentation of his lower-bunk
restriction, Defendant Terry "failed to provide [him] with this
paperwork," (id. at ¶ 28), but instead "gave the plaintiff
paperwork to clear the me[t]al detectors."  (Compl. at 9.)
    The Court will grant Defendants Terry's and CMS's motion for
summary judgment as to Plaintiff's claims arising out of his
conditions of confinement.  In order to state an Eighth Amendment
conditions of confinement claim, a plaintiff must allege that the
defendant "acted with deliberate indifference in subjecting him
to [the] deprivation [in question]."  Griffin v. Vaughn, 112 F.3d
703, 709 (3d Cir. 1997).  Allegations of merely negligent conduct
by a defendant are likewise insufficient to state a claim under
the ADA if the conduct in question did not occur "by reason of
[the plaintiff's] disability."  42 U.S.C. § 12132; see Forestier
Fradera v. Municipality of Mayaguez, 440 F.3d 17, 22-23 (1st Cir.
2006) (summary judgment as to ADA claim appropriate where
evidence fails to suggest "an inference of discrimination[,] . .
. [action taken] because of [the plaintiff's] disability[, or] .
. . disability-based animus on defendants' part").  In this case,
Plaintiff's allegation that Defendant Terry gave him a metal
detector permission slip when he asked for confirmation of his
lower-bunk medical restriction is at most suggestive of
negligence.  There are no allegations, much less evidence, to
suggest that Defendants Terry and CMS withheld the documentation
Plaintiff requested with "deliberate indifference," Griffin, 112
F.3d at 709, or "because of [Plaintiff's] disability." § 12132.
Defendants Terry's and CMS's motion for summary judgment will
accordingly be granted.  No reasonable jury could find that Nurse
Terry's conduct, in allegedly providing paperwork that gave
special accommodation for metal detector screening when Mr.
Muhammad sought the lower bunk restriction confirmation,
occurring on one occasion, rises to the level of deliberate
indifference to his serious medical needs.

abrogates sovereign immunity "insofar as Title II creates a
private cause of action for damages against the States for
conduct that <u>actually</u> violates the Fourteenth Amendment."  546
U.S. at 159 (emphasis in original).  According to Plaintiff,
because the officers' conduct was independently unlawful under
the Eighth Amendment, the DOC is not immune from his ADA claim.
Moreover, Plaintiff argues, even if the officers' conduct did not
rise to the level of an Eighth Amendment violation, Title II
validly abrogates sovereign immunity because under section 5 of
the Fourteenth Amendment, Congress may "enact so-called
prophylactic legislation that proscribes facially constitutional
conduct, in order to prevent and deter unconstitutional conduct."
<u>Nevada Dept. of Human Resources v. Hibbs</u>, 538 U.S. 721, 727-28
(2003).

　　　In order to resolve these issues, the Court must determine
whether (1) there is a genuine issue of material fact as to
whether the DOC violated the ADA, and, if so, (2) "whether
Congress's purported abrogation of sovereign immunity as to that
class of conduct" is valid.  <u>Georgia</u>, 546 U.S. at 159.  The
following discussion reviews <u>Georgia</u>'s prescription for the
Court's approach to these questions, and applies that approach to
the issues raised in this case.  As the analysis herein makes

clear, the Court answers both questions in the affirmative.[14]

> 1.  Abrogation of Sovereign Immunity Under Section 5
>     of the Fourteenth Amendment

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Title II authorizes private lawsuits for money damages against public entities that violate its provisions.  § 12133.  Because "[u]nder the Eleventh Amendment to the United States Constitution, an unconsenting state is immune from suit in federal court filed by one of its own citizens, irrespective of the type of relief sought," Pappas v. Township of Galloway, 565 F. Supp. 2d 581, 586-87 (D.N.J. 2008) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99-100 (1984)), Plaintiff's claim against the DOC must be dismissed unless Congress validly abrogated states' sovereign immunity as to the class of conduct at issue in this case when it enacted Title

---

[14]  Defendants Williams and DeMaio have also moved for summary judgment as to Plaintiff's Eighth Amendment claims against them.  As the following discussion makes clear, the analysis of the DOC's Eleventh Amendment immunity defense herein necessarily addresses the viability of Plaintiff's Eighth Amendment claims against these Defendants.

II.[15]

As the Supreme Court has explained, Congress may abrogate states' sovereign immunity "if it makes its intention to abrogate unmistakably clear in the language of the statute and acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment."  Hibbs, 538 U.S. at 726.  "The first prong of this test is easily satisfied in this case, as Title II of the ADA provides that '[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation.'  42 U.S.C. § 12101(b)(4)[.]"  Bowers v. National Collegiate Athletic Ass'n, 475 F.3d 524, 550 (3d Cir. 2007).

With regard to the second prong,

> the Supreme Court has held that Title II of the ADA validly abrogates sovereign immunity as to (1) state conduct that actually violates the Constitution, United States v. Georgia, 546 U.S. 151 (2006), and (2) some classes of state conduct that do not facially violate the Constitution but are prohibited by Title II in order to "prevent and deter unconstitutional conduct." [Tennessee v. Lane, 541 U.S. 509, 518, 529 (2004)].

Toledo v. Sanchez, 454 F.3d 24, 31 (1st Cir. 2006); see also Bowers, 475 F.3d at 550-51.  Under United States v. Georgia, in order to determine whether Plaintiff may sue the DOC for damages

---

[15]  Plaintiff has not suggested that the DOC is anything other than an arm of the State of New Jersey.  See Bowers, 475 F.3d at 545-46.

under Title II, the Court must assess

> on a claim-by-claim basis, (1) which aspects of the
> state's alleged conduct violated Title II; (2) to what
> extent such misconduct also violated the Fourteenth
> Amendment; and (3) insofar as such misconduct violated
> Title II but did not violate the Fourteenth Amendment,
> whether Congress's purported abrogation of sovereign
> immunity as to that class of conduct is nevertheless
> valid.

Georgia, 546 U.S. at 159.  These considerations are addressed in

turn below.

### 2.  Violation of Title II

Viewing the evidence in the light most favorable to

Plaintiff, it is clear that Plaintiff's ADA claim against the DOC

arising out of his transfer to the upper-level bunk of a second-

floor cell with limited access to the handicapped-accessible

shower states a valid ADA claim, and the evidence of record

raises a question of fact as to the merits of the claim that

cannot be resolved upon summary judgment.[16]  To succeed on a

---

[16]  In its Reply Brief submitted in support of its motion
for summary judgment, the DOC suggests for the first time in this
three-year-old lawsuit that because Plaintiff never served the
DOC with the Summons and Complaint in Civil Action 05-5001, his
ADA claim regarding the conditions of his confinement should be
dismissed under Rule 4(m), Fed. R. Civ. P.  As the evidence
submitted by Plaintiff in his Sur-Reply indicates, it seems that
Plaintiff, who initiated this action pro se and while
incarcerated, completed the steps necessary for the United States
Marshal's Office to effect service, that a Summons for the DOC
was issued, but that, due to an oversight by the Marshal, the
Summons and Complaint were not served upon the DOC.  (Martinez
Cert. ¶¶ 2, 4-7.)
     As Plaintiff notes, numerous courts have recognized that

an incarcerated pro se plaintiff proceeding in forma

claim under Title II, Plaintiff must establish that: "(1) he is a qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability."  <u>Bowers</u>, 475 F.3d at 553 n.32.  Under Title II, the failure of a public entity to provide disabled persons with reasonable modifications constitutes discrimination within the meaning of the Act.  <u>See</u>, <u>e.g.</u>, <u>Townsend v. Quasim</u>, 328 F.3d 511, 517 (9th Cir. 2003); 28 C.F.R. § 35.130(b)(7).

    Defendants do not appear to challenge Plaintiff's claim that he is a qualified individual with a disability.  As to whether the DOC failed to provide Plaintiff with a reasonable modification, and thereby discriminated against him because of

_____

        pauperis is entitled to rely on the U.S. Marshal for
        service of the summons and complaint, and, having
        provided the necessary information to help effectuate
        service, plaintiff should not be penalized by having his
        or her action dismissed for failure to effect service
        where the U.S. Marshal or the court clerk has failed to
        perform the duties required of each of them . . .

<u>Puett v. Blandford</u>, 912 F.2d 270, 275 (9th Cir 1990); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Rochon v. Dawson</u>, 828 F.2d 1107 (5th Cir. 1987); <u>Romandette v. Weetabix Co.</u>, 807 F.2d 309, 310 n.1 (2nd Cir. 1986).  It is also not insignificant that the DOC has not suggested that it has been prejudiced by the failure to serve process, and, indeed, the State has defended Defendants Williams and DeMaio charges arising out of the same set of facts throughout this case.
        Because Plaintiff provided the necessary information to the Marshal to effectuate service, the Court will extend the time for service by thirty days from the entry of the Order accompanying this Opinion pursuant to Rule 4(m), Fed. R. Civ. P.

his disability, Plaintiff's evidence is more than sufficient to withstand Defendants' motion for summary judgment.  Based on the evidence of record, a jury could reasonably find that, notwithstanding Plaintiff's protests and his request to remain in a first-floor cell close to the handicapped-accessible shower, the DOC transferred Plaintiff to the upper bunk of a second-floor cell – accessing which caused Plaintiff "great pain in [his amputated] limb and back" – with limited access to the only handicapped-accessible shower, and filled Plaintiff's place in the handicapped-accessible cell with a non-disabled inmate. (Muhammad Aff. ¶¶ 16-18.)  A jury could likewise find that permitting Plaintiff to remain in the handicapped-accessible cell would have been a reasonable accommodation, in view of the fact that his lower-level bunk was subsequently occupied by a non-disabled inmate, (id. at ¶ 17), and given that the DOC appears to have advanced no penological explanation for the conditions of Plaintiff's confinement.  Cf. Young v. Quinlan, 960 F.2d 351, 364 (3d Cir. 1992), superseded on other grounds by 42 U.S.C. § 1997e(a) (recognizing that deprivations in conditions of confinement may constitute cruel and unusual punishment when they are "totally without penological justification.").

     In short, the transfer of Plaintiff, apparently without penological justification, to a cell which was painful for him to access and which had restricted access to the handicapped-

accessible shower, when a reasonable accommodation appears to have been readily available, is sufficient to "state[] a claim under Title II." Bowers, 475 F.3d at 553.

    3.    Violation of the Fourteenth Amendment

Under Georgia, the Court's next task is to determine "to what extent . . . [the State's alleged] misconduct also violated the Fourteenth Amendment."[17] Georgia, 546 U.S. at 159.  As the Supreme Court explained in that case, although the scope of Congress's section 5 power to enact prophylactic legislation targeting state conduct that is not itself unconstitutional presents a difficult legal question, "no one doubts that § 5 grants Congress the power to enforce the provisions of the Amendment by creating private remedies against the States for actual violations of those provisions." Id. at 158 (internal quotations and citations omitted) (holding that "insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity").

The Court finds that Plaintiff has adduced sufficient evidence in this case to demonstrate, upon summary judgment, that the alleged misconduct by the DOC and its officers, if proven at

_____

[17]   It is well-settled that the Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's prohibition of cruel and unusual punishment.  See Francis v. Resweber, 329 U.S. 459, 463 (1947) (plurality opinion).

trial, violated Plaintiff's rights under the Eighth Amendment. "The Eighth Amendment to the United States Constitution prohibits any punishment which violates civilized standards and concepts of humanity and decency." Young, 960 F.2d at 359 (citing Estelle v. Gamble, 429 U.S. 97, 102-03 (1976)).  In an Eighth Amendment action challenging the conditions of an inmate's confinement,

> an inmate must show that he has been deprived of the minimal civilized measure of life's necessities.  This includes proving [1] that the deprivation suffered was sufficiently serious, and [2] that a prison official acted with deliberate indifference in subjecting him to that deprivation.

Griffin v. Vaughn, 112 F.3d 703, 709 (3d Cir. 1997) (internal quotations and citations omitted).  As the Court of Appeals has explained, what is necessary to establish an Eighth Amendment violation

> varies according to the nature of the alleged constitutional violation . . . . When an Eighth Amendment claim arises in the context of a challenge to conditions of confinement, we must determine if prison officials acted with deliberate indifference to the inmate's health.  The objective inquiry is whether the inmate was denied the minimal civilized measure of life's necessities.

Fuentes v. Wagner, 206 F.3d 335, 344-45 (3d Cir. 2000) (internal quotations and citations omitted).

In this case, Plaintiff's evidence is clearly sufficient to raise a jury question as to the subjective prong – i.e., whether "prison officials acted with deliberate indifference to the inmate's health." Id.  According to Plaintiff, he explained to

Defendants Williams and DeMaio that accessing the upper bunk of
his new cell was "not only unsafe but caused [him] great pain in
[his amputated] limb and back"; that he was totally incapable of
using the showers on the second floor;[18] and that he was unable
to access the first-floor, handicapped-accessible shower because,
due to his disability, he was unable to descend the flight of
stairs before non-disabled inmates occupied the shower.
(Muhammad Aff. ¶¶ 18-22.)  A jury could find that Defendants
Williams and DeMaio "refused to accommodate [Plaintiff]," (id. at
¶ 22), either to "pick[] on" him or because they "didn't care"
about the difficulties the cell transfer imposed.  (Muhammad Dep.
at 46-47.)  This evidence is sufficient to raise a jury question
as to whether these Defendants "acted with deliberate
indifference in subjecting [Plaintiff] to [the] deprivation"
alleged.  Griffin, 112 F.3d at 709.  As the Court of Appeals
recognized in the context of discussing an Eighth Amendment
claim, "[s]tate of mind is typically not a proper issue for
resolution on summary judgment."  Young, 960 F.2d at 360 n.21
(citation omitted) (also noting that "[w]hen state of mind is an
essential element of the nonmoving party's claim, resolution of
the claim by summary judgment is often inappropriate because a
party's state of mind is inherently a question of fact which

_____

[18]  Plaintiff testified that because of his disability, he
was required to sit down while showering and was incapable of
using the showers on the second floor.  (Muhammad Dep. at 20.)

31

turns on credibility").

The Court further finds that the objective requirement of a sufficiently serious deprivation is satisfied in this case.  As the Court of Appeals has explained,

> [t]here is no static test by which courts determine whether conditions of confinement are cruel and unusual. Rather, what constitutes cruel and unusual punishment is measured by the evolving standards of decency that mark the progress of a maturing society.

Id. at 359.

It is, of course, well-settled that "the Constitution does not mandate comfortable prisons." Rhodes v. Chapman, 452 U.S. 337, 349 (1981).  At the same time, however, "[a]s a society, we have grown increasingly sensitive to the need to accommodate individuals with disabilities," and in the context of disabled prisoners' Eighth Amendment claims, numerous "courts have found that the failure to provide handicapped accessible bathroom facilities may give rise to a constitutional claim." Frost v. Agnos, 152 F.3d 1124, 1129 (9th Cir. 1998) (citing cases).  In Frost, for example, the court reversed the district court's entry of summary judgment as to the issue of whether an inmate with a broken leg had an Eighth Amendment right to shower in a handicapped-accessible facility.  Id.  The court explained that

> although we recognize the wisdom of deferring to prison officials' considered judgment regarding the proper way to administer a prison, Procunier v. Martinez, 416 U.S. 396, 405 (1974), Defendants are not excused from taking reasonable measures to assist Frost in showering safely. Frost suggests a variety of options that he alleges would

have met his safety needs.  For example, he contends that
he would have been aided by a chair in the shower, a
handicapped bar, or the provision of extra guards to
assist him.  The fact that such basic steps could have
better guaranteed Frost's safety provides evidence that
Defendants were deliberately indifferent in failing to
provide any accommodations whatsoever.  Accordingly, we
conclude that a triable issue of fact exists with regard
to whether the failure to provide Frost with adequate
shower facilities resulted in the violation of his
constitutional rights . . .

Id.

Similarly, in Casey v. Lewis, 834 F. Supp. 1569 (D. Ariz.

1993), in which inmates with prosthetic limbs "were not provided

with the necessary facilities, including accessible bathrooms,

showers and cells, for their disabilities," the court determined

that the prison officials had violated the inmates' Eighth

Amendment rights.  834 F. Supp. at 1582.  The court expressly

recognized that under the Eighth Amendment, "[d]isabled inmates

must be provided with physical accommodations necessary because

of their disabilities, including adequate toilet and shower

facilities."  Id. at 1581 (citations omitted); see also Partelow

v. Massachusetts, 442 F. Supp. 2d 41, 50 (D. Mass. 2006)

(recognizing that "reasonable access to safe bathing . . .

constitute[s] a component of civilized living" for purposes of a

disabled prisoner's Eighth Amendment claim); Ruiz v. Estelle, 503

F. Supp. 1265, 1345 (S.D. Tex. 1980), rev'd in part on other

grounds 679 F.2d 1115 (5th Cir. 1982), opinion amended, 688 F.2d

266 (5th Cir. 1982) (observing, in adjudicating Eighth Amendment

33

claim of disabled inmates, that "[c]ommunity standards, as reflected in a number of state and federal laws, make it clear that the evolving standards of decency include special concern for the misfortunes of those who are physically and mentally handicapped").

In a similar vein, Justice Powell, sitting by designation on the Court of Appeals for the Fourth Circuit, addressed the Eighth Amendment claim of a disabled inmate who had no access to a handicapped-accessible restroom in LaFaut v. Smith, 834 F.2d 389 (4th Cir. 1987).  In LaFaut, a mobility-impaired inmate was confined in a cell with no handicap restroom facilities.  Id. at 392.  Although the inmate complained about the facilities to prison officials immediately upon arrival at the prison, the officials did not transfer him to a room with "adequate toilet facilities" for three months.  Id.  The court explained:

> We recognize that prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.  There is nothing in the record before us, however, to justify the inordinate delays in accommodating appellant's needs in light of the practicality and availability of various solutions.  Prison officials should not ignore the basic needs of a handicapped individual or postpone addressing those needs out of mere convenience or apathy.

Id. at 394 (internal quotations and citations omitted).  The court accordingly held that the defendant's "neglect constituted 'deliberate indifference' and therefore violated the Eighth

34

Amendment." <u>Id.</u>; <u>see also</u> <u>Simmons v. Cook</u>, 154 F.3d 805, 808
(8th Cir. 1998).

    Applying the above-cited authority to the facts of this
case, the Court holds that the deprivations Plaintiff allegedly
suffered were "sufficiently serious" to state an Eighth Amendment
claim. <u>Griffin</u>, 112 F.3d at 709. Like the plaintiffs in <u>Frost</u>
and <u>Casey</u>, Plaintiff's disability makes it impossible for him to
safely use a shower that is not equipped with handicapped-
accessible accommodations; Plaintiff's deposition testimony
states that he is "unable to shower in the regular shower."
(Muhammad Dep. at 20.) As a result of the cell transfer,
Plaintiff "wasn't able to take showers," (<u>id.</u> at 45), because his
second-floor cell was located "far away from the handicap[ped-]
accessible shower," and non-disabled inmates used the shower
before Plaintiff could reach it. (Muhammad Aff. ¶¶ 16, 20-21.)
Additionally, like the plaintiffs in <u>Casey</u> and <u>LaFaut</u>,
Plaintiff's second-floor cell was not handicapped-accessible;
Plaintiff experienced "great pain in [his amputated] limb and
back" when attempting to access his upper bunk. (<u>Id.</u> at ¶ 18.)

    Significantly, as was the case in <u>LaFaut</u> and <u>Frost</u>, "[t]here
is nothing in the record . . . to justify the inordinate delays
in accommodating [Plaintiff's] needs in light of the practicality
and availability of various solutions." <u>LaFaut</u>, 834 F.2d at 394;
<u>Frost</u>, 152 F.3d at 1129. Whereas the <u>LaFaut</u> court found that

prison officials' three-month delay in responding to an inmate's request for handicapped-accessible facilities, and the deprivations imprisonment without such facilities imposed, amounted to an Eighth Amendment violation, see LaFaut, 834 F.2d at 394, Plaintiff in this matter was allegedly deprived reasonable access to handicapped-accessible restroom facilities and a bunk he could access without experiencing pain for five months, notwithstanding his complaints to Defendants Williams and DeMaio.  (Compl. at 9.)

Likewise, just as the Frost court took note of the fact that the deprivations to which the inmate-plaintiff was exposed could have been cured by taking "basic steps," Frost, 152 F.3d at 1129, nothing in the record undermines Plaintiff's allegation that the DOC and its officers could have accommodated Plaintiff's disability simply by returning him to the first-floor cell in which he was originally housed; this is particularly true in light of the fact that the "inmate who replaced [Plaintiff] in [his] original handicapped cell . . . had no reason for a handicapped cell as he had no physical disability."  (Muhammad Aff. ¶ 17.)  In other words, on this record, the deprivations to which Plaintiff was subjected appear to have been "totally without penological justification," Young, 960 F.2d at 364, undercutting the "wide-ranging deference" typically afforded "prison administrators . . . in the adoption and execution of

[prison] policies and practices."[19]  LaFaut, 834 F.2d at 394 (citation omitted).

It is admittedly the case that the conditions of confinement to which Plaintiff was exposed as a result of the cell transfer were not "physically barbarous," id. at 391, in that they caused Plaintiff to be unable to shower and to experience "great pain," but no permanent or life-threatening injuries.  (Muhammad Aff. ¶ 18.)  Plaintiff did not, for example, fall and injure himself while attempting to use the handicapped-inaccessible, second-floor showers, see Frost, 152 F.3d at 1129, fall off the ladder while climbing into his bunk using his prosthetic leg, see LaFaut, 834 F.2d at 393, or fall while attempting to rush down the stairs to the first-floor shower on his prosthetic leg.  But it is well-settled that "the Eighth Amendment protects against future harm to inmates . . . [in that] a remedy for unsafe conditions need not await a tragic event."  Helling v. McKinney, 509 U.S. 25, 33 (1993).  Moreover, "an inmate need not suffer

---

[19]  It bears noting that in Frost, unlike in this case, the defendants did offer a penological explanation for the deprivations to which the inmate was exposed, arguing that the inmate's "close custody classification precluded them from placing him in the handicapped housing unit."  Frost, 152 F.3d at 1129.  The court nonetheless held that "although Frost's classification was related to a legitimate penological interest, a close custody classification does not relieve jail officials of the duty of providing for his safety" by affording "reasonable measures to assist Frost in showering safely."  Id.  Nothing in the record here is suggestive of even the inadequate penological justification addressed in Frost.

physical torture or a lingering death" to state a valid Eighth Amendment claim, <u>Monmouth County Correctional Institutional Inmates v. Lanzaro</u>, 834 F.2d 326, 348 (3d Cir. 1987) (internal quotations and citations omitted), as cases finding unconstitutional conditions of confinement demonstrate.  <u>See</u>, <u>e.g.</u>, <u>Helling</u>, 509 U.S. at 27-28 (inmates' exposure to environmental tobacco smoke states a claim for unconstitutional conditions of confinement); <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 188 (3d Cir. 1993) (inmates' exposure to lice unlawful under Eighth Amendment).  This is especially so when Plaintiff's condition rendered the shower facilities inaccessible to him, forcing him to make the choice between encountering risk of further injury and taking no shower at all.  Where Defendants' alleged indifference to Plaintiff's plight continued for five months, upon the view of the evidence most favorable to Plaintiff, an Eighth Amendment violation may be shown at trial.

In summary, accounting for the evidence in the record and the recognition by numerous courts that under the Eighth Amendment, "[d]isabled inmates must be provided with physical accommodations necessary because of their disabilities, including adequate toilet and shower facilities," the Court finds that the deprivation Plaintiff allegedly suffered was sufficiently serious to violate his Eighth Amendment rights.  <u>Casey</u>, 834 F. Supp. at 1581; <u>see also</u>  <u>Frost</u>, 152 F.3d at 1129; <u>LaFaut</u>, 834 F.2d at 394;

Partelow, 442 F. Supp. 2d at 50; Ruiz, 503 F. Supp. at 1345. In light of the evidence suggesting that Defendants Williams and DeMaio were deliberately indifferent to this deprivation, discussed supra, these Defendants' motion for summary judgment as to Plaintiff's section 1983 claim will be denied.[20] The implications of this analysis for the viability of Plaintiff's ADA claim against the DOC are addressed infra.

    4.   Abrogation of Sovereign Immunity

In view of the Court's conclusion that the conditions of confinement to which Plaintiff was allegedly exposed violated both Title II of the ADA and the Eighth Amendment, the Court need not undertake Georgia's final step of assessing "insofar as [the alleged] misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." Georgia, 546 U.S. at 159. This is because, as the Supreme Court held in Georgia, "insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." Id. Because section 5 "grants Congress the power to enforce the provisions of

---

    [20] Moreover, as the Frost court explained, "[t]he fact that such basic steps could have better guaranteed Frost's safety provides evidence that Defendants were deliberately indifferent in failing to provide any accommodations whatsoever." Frost, 152 F.3d at 1129.

the [Fourteenth] Amendment by creating private remedies against
the States for _actual_ violations of those provisions," _id._ at
158, and because Plaintiff's evidence, if credited by the jury,
is sufficient to demonstrate that he was subjected to
unconstitutional conditions of confinement, _see_ _supra_, the Court
holds that the DOC's sovereign immunity defense is insufficient
to defeat Plaintiff's ADA claim against it, and will deny the
DOC's motion for summary judgment as to Plaintiff's Title II
claim.

## IV.   CONCLUSION

For reasons expressed above, the Court will grant the motion
for summary judgment of Defendants Reddy, Terry, and CMS as to
all of Plaintiff's claims; grant the DOC's motion for summary
judgment as to Plaintiff's ADA claim arising out of the provision
of inadequate medical treatment; deny the DOC's motion for
summary judgment as to Plaintiff's ADA claim arising out of the
conditions of his confinement; and deny Defendants Williams' and
DeMaio's motion for summary judgment as to Plaintiff's Eighth
Amendment claim.   The accompanying Order will be entered.


**November 12, 2008**                 **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      United States District Judge

40